No. 92,438

STATE OF KANSAS, *Appellee*, v. MARCUS B. WASHINGTON,
*Appellant.*
(123 P.3d 1265)

Opinion filed
December 9, 2005.

*Janine Cox*, capital appellate defender, argued the cause and was on the brief for appellant.

*Jerome A. Gorman*, district attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Marcus Washington was convicted of first-degree premeditated murder and criminal possession of a firearm and sentenced to 50 years in prison without the possibility of parole (a hard 50 sentence). On direct appeal, the Kansas Supreme Court affirmed his convictions but remanded for resentencing in *State v. Washington*, 275 Kan. 644, 68 P.3d 134 (2003). Washington appeals the trial court's imposition of a hard 50 sentence on remand.

Marcus Washington was convicted of first-degree premeditated murder and criminal possession of a firearm based upon the January 16, 2000, shooting death of Stacey Quinn. At the sentencing hearing, the trial court found that two aggravating factors existed:

(1) The defendant was previously convicted of a felony in which he inflicted death on another (involuntary manslaughter); and (2) the crime was committed in a heinous, atrocious, and cruel manner. Regarding the second factor, the trial court reasoned that the victim was shot with 11 specific bullets, that the defendant used two separate 10-shot clips, and that the victim "knew early on her fate as she hopped across the street and she watched [the defendant] as he approached from across the street prior to being shot and ultimately meeting her death." The court found that the only mitigating circumstance was that "there is some marginal reason to believe that the defendant was under extreme mental or emotional disturbance."

The court concluded that the aggravating factors substantially outweighed the mitigating factor and sentenced the defendant to 50 years in prison without the possibility of parole (a hard 50 sentence). On direct appeal, the Kansas Supreme Court affirmed his convictions but for reasons relating to other than the aggravating and mitigating factors vacated the sentence and remanded for resentencing in *State v. Washington*, 275 Kan. 644, 68 P.3d 134 (2003).

At resentencing, the trial court reaffirmed its findings at the original sentencing hearing that two aggravating factors existed. The first aggravating factor was that the defendant had been convicted of killing another individual, and although the defendant was young at the time of this crime and an issue arose about its defensive nature, no question existed that the earlier homicide had taken place. The trial court found the existence of the second aggravating factor, reasoning:

"The other aggravating factor that the court found was that this crime was committed in an especially heinous, atrocious, or cruel manner. And I made some reference to the fact that that is not always a factor found in a homicide involving a firearm. In fact, oftentimes it is not found because of the instantaneous nature of the death at times.

"But I do vividly recall the testimony of the one witness who indicated that she had looked out of the window of her house when she heard the gunshots, heard the noises outside, and saw Ms. Quinn hopping across the street. And my recollection is that the pathologist's testimony was one of the gunshot wounds was to

the leg or the foot or the ankle, something of that nature. That would have supported the witness' description of seeing this victim hopping across the street.

"And then Mr. Washington not running across the street, but walking across the street approaching this victim, who I believe was on the porch of a house that she had gone to. And other witnesses had testified that they heard her crying for help as she was lying on that porch. And that the testimony was then that she was shot numerous times. There were in fact, eleven gunshot wounds that she suffered—separate gunshot wounds.

"The significance of that number came from the fact that there were two magazines found at the scene, each of which—or I guess they weren't found at the scene. As I recall, maybe they were found at the time that Mr. Washington was arrested. But I recall that they both carried a maximum of ten shots, which was an indication that given the eleven gunshot wounds the defendant had fired some number of shots, removed one magazine and put another one in and continued to shoot."

The trial court proceeded to find the existence of two additional similar mitigating factors under K.S.A. 21-4637(e) and (f) in addition to the being under the influence of extreme mental or emotional disturbance at the time: (1) The defendant acted under extreme distress or under the substantial domination of another person, and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The court found all three mitigating factors involved the issue of posttraumatic stress disorder, which the court recalled, the State's expert, Dr. William Logan, had testified did not negate the premeditation and intent necessary for the first-degree murder. The court stated it would be very difficult to find that the defendant was not aware of his actions even if he was suffering from posttraumatic stress disorder, which the defense expert Dr. Gilbert Parks could not debunk.

The court concluded that the aggravating factors outweighed the mitigating factors reasoning that it did not "believe that they in any way explain what happened here or detract from the manner in which it was performed." The trial court imposed a hard 50 sentence on the first-degree premeditated murder conviction to run concurrently to an 18-month sentence for the criminal possession of a firearm conviction. The defendant appeals arguing (1) that the evidence fails to support the trial court's determination that the

crime was committed in an especially heinous, atrocious, or cruel manner; and (2) that the hard 50 sentence is unconstitutional.

(1) Especially Heinous, Atrocious, or Cruel Manner

Kansas law provides that if a defendant is convicted of premeditated first-degree murder, the trial court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 50 years without eligibility for parole, *i.e.*, the hard 50 sentence. K.S.A. 2004 Supp. 21-4635(a); K.S.A. 2004 Supp. 21-4638. Kansas law also requires the trial court to make that determination after considering evidence of aggravating and mitigating circumstances. K.S.A. 2004 Supp. 21-4635(b). If the trial court finds that one or more of the aggravating circumstances enumerated in K.S.A. 2004 Supp. 21-4636 exists and that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances, the defendant shall receive the hard 50 sentence. K.S.A. 2004 Supp. 21-4635(c).

"When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence." *State v. Buehler-May*, 279 Kan. 371 Syl. ¶ 12, 110 P.3d 425 (2005).

The defendant challenges the imposition of the hard 50 sentence based upon the trial court's finding that the murder was committed in an especially heinous, atrocious, or cruel manner under K.S.A. 2004 Supp. 21-4636(f). The defendant argues the evidence was insufficient to support this aggravating circumstance.

K.S.A. 2004 Supp. 21-4636(f) describes the relevant aggravating circumstance as follows:

"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

(1) Prior stalking of or criminal threats to the victim;

(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

(3) infliction of mental anguish or physical abuse before the victim's death;

(4) torture of the victim;

(5) continuous acts of violence begun before or continuing after the killing;

(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel."

The defendant argues that the evidence in this case does not support a finding that any of the first six factors were present and no exceptional circumstances exist in this case to support the only remaining factor, "any other conduct in the opinion of the court is especially heinous, atrocious or cruel." See K.S.A. 2004 Supp. 21-4636(f)(7). Attacking the trial court's reasoning, he contends none of the witnesses testified to actually seeing the victim being shot or the defendant standing over the victim during the shooting, the autopsy revealed no soot or stippling on the body which would indicate that the shooter was 4 or 5 feet away, and the doctor who performed the autopsy opined that the victim would have bled to death quickly from the gunshot injury to the heart.

The State responds that evidence supported both the third factor ("infliction of mental anguish or physical abuse before the victim's death") and the seventh factor ("any other conduct in the opinion of the court that is especially heinous, atrocious or cruel"). See K.S.A. 2004 Supp. 21-4636(f)(3) and (7). The State points to evidence that the victim was shot by the defendant in the street, was seen hopping through the street for her life, and cried out for help and knocked on a neighbor's door without any response, until the defendant caught up with her and fired another round of shots. The State contends this evidence is analogous to *State v. Brady*, 261 Kan. 109, 123-24, 929 P.2d 132 (1996), and demonstrates extreme fear, a conscious physical pain, and mental anguish sufficient to support a finding that the murder was committed in an especially heinous, atrocious, or cruel manner. See also *State v. Lessley*, 271 Kan. 780, Syl. ¶ 5, 26 P.3d 620 (2001) ("A crime is committed in an especially heinous, atrocious, or cruel manner when the per-

petrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to his or her ultimate fate.").

Both parties acknowledge the general rule that shooting deaths normally do not fall under this exception:

"All murders are heinous, atrocious, and cruel; however, exceptional circumstances must exist before a murder can be classified as such under K.S.A. 2003 Supp. 21-4636(f). The hard 40 sentence should be reserved for special cases; otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases. Standing alone, the fact that the cause of death was a shooting is not enough to rise to the level of an especially heinous, atrocious, or cruel manner for hard 40 sentencing purposes." *State v. Holmes*, 278 Kan. 603, Syl. ¶ 21, 102 P.3d 406 (2004).

"Shooting deaths are not generally considered to rise to the level of being heinous, atrocious, or cruel." 278 Kan. at 638.

In *Holmes*, this court discussed an exception to this general rule in *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 (1995), and *State v. Brady*, 261 Kan. 109, 123-24, 929 P.2d 132 (1996). In *Alford*, the court concluded the murder was heinous, atrocious, or cruel where Alford chased the victim into the lobby of the restaurant, shot her twice, and forced her back into the kitchen. When she attempted to escape, he shot her again, dragged her around the corner of the kitchen, and fired the final two shots. 257 Kan. 838. In *Brady*, the victims were forced to lie face down on the floor for 15 minutes not knowing what was going to happen while Brady paced the room holding a gun before ultimately shooting them both in the head.

The *Holmes* court distinguished its facts from *Alford* and *Brady* because the victim was not chased or forced to lie on the floor awaiting death, but rather was hit in the head with a hammer, introduced a gun into the fight, and the defendant's threats were made instantaneously with the shooting during the ensuing struggle. 278 Kan. at 639; see also *State v. Flournoy*, 272 Kan. 784, 791-94, 36 P.3d 273 (2001) (distinguishing itself from *Alford* and *Brady* because the shooting took place in 1 minute and the victim was not chased or forced to lie on the floor awaiting death).

In this case, neighbors of the crime scene testified that they heard a series of gunshots, heard a woman cry out for help, they called the police, and then heard a second round of gunshots. One witness estimated that less than a minute elapsed between the first volley of shots and the woman's cry, and less than a minute elapsed between the cry and the second volley. Another witness testified that after the first round of shots, she saw a young lady hopping in the street, she heard the victim knocking on a neighbor's door pleading for help for quite some time, saw someone standing in that neighbor's driveway, and then heard another round of gunfire. Another witness saw the defendant run across her lawn holding a gun after the second set of gunshots.

The crime scene investigation supported this testimony. It revealed shell casings at the intersection of 33rd and Farrow and near where the victim was found on the lawn at 3217 Farrow. One of the victim's shoes was found in the intersection as well. The pathologist testified the victim suffered numerous gunshot wounds to her neck, chest, torso, and extremities (including her thighs); however, none of the wounds would have rendered her unconscious immediately. Nevertheless, the pathologist testified that with her gunshot injury to the heart, she would "probably have to have a cardiac transplant team standing there ready to open the chest" in order to prevent her from bleeding to death. Although the pathologist stated that you do not see soot or stippling when the shooter is standing 4 or 5 feet away, he also indicated that with modern handguns he usually does not see stippling when the shooter is as close as 2 to 3 feet away from the victim.

Viewing this evidence in the light most favorable to the prosecution, this case is analogous to *Alford* as the defendant shot the victim several times, she attempted to run (hop) away crying out for help, she made it to the porch of a neighbor who would not answer her pleas, and the defendant pursued her there and shot her repeatedly, at some point pausing to change the magazine in the gun. The sole distinguishing factor weighing against the aggravating circumstance is that the shootings took place within a short period of time, approximately 2 minutes, and the victim was pronounced dead within approximately 25 minutes of the shooting.

Nevertheless, it is clear that the victim was chased and suffered substantial mental anguish as demonstrated by her attempt to escape on one foot and her repeated cries for help before she was killed. As such, the fact that the murder was committed in an especially heinous, atrocious, or cruel manner is supported by a preponderance of the evidence.

Although the defendant does not specifically argue that the trial court erred in weighing the aggravating and mitigating factors in this case, he does point out an error in the trial court's recollection of the defense expert's testimony concerning the defendant's state of mind. We will consider the weighing of the factors implicit in the defendant's argument and proceed to consider the propriety of the trial court's weighing of the aggravating and mitigating factors.

Our standard of review on the trial judge's weighing of aggravating and mitigating factors is abuse of discretion. Judicial discretion is abused when no reasonable person would have taken the position taken by the trial court. *State v. Robertson*, 279 Kan. 291, 308, 109 P.3d 1174 (2005).

We first note that in addition to the aggravating factor discussed above, the trial court also found the existence of another aggravating factor, namely, that the defendant possessed a 1995 conviction for involuntary manslaughter. See K.S.A. 2004 Supp. 21-4636(a) ("The defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another."). The defendant does not dispute the existence of this aggravating factor on appeal.

On the other side of the equation, the trial court found that the three mitigating factors all related to the defendant's posttraumatic stress disorder. See K.S.A. 21-4637(b) ("The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances."); K.S.A. 21-4637(e) ("The defendant acted under extreme distress or under the substantial domination of another person."); and K.S.A. 21-4637(f) ("The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.").

At trial, defense expert Dr. Parks testified that the defendant had posttraumatic stress disorder and was incapable of forming the requisite intent to commit first-degree premeditated murder as he was in a fight or flight state and was suffering from an acute stress disorder. The State's expert, Dr. Logan, testified that there was not enough documentation to support this point of view, pointing to some of the behaviors exhibited by the defendant, such as pursuing a woman who was retreating from him, allowing a stranger into his car who was asking for drugs, or not remembering details of the event until several months following the shooting. Dr. Logan explained that his criticism was not whether the defendant in fact had posttraumatic stress disorder, but that he did not see how it related to the killing of the victim in this case.

In his brief, the defendant suggests that the trial court mistakenly stated that defense expert Dr. Parks did not find that he was incapable of forming the requisite intent to commit murder; however, the defendant is misconstruing the trial court's recollection of the testimony at trial.

When discussing the requisite intent, the trial court in this case referred to Dr. Logan, not Dr. Parks, as suggested in the defendant's brief:

"I kind of remember that *Dr. Logan* indicated that it well may be that the defendant was suffering from posttraumatic stress disorder. That he could—he certainly was not in a position to establish that the defendant was not suffering from that disorder. His testimony at trial was that despite that condition of the defendant, it was not of such a nature that it kept him from forming the requisite intent to commit the first-degree murder." (Emphasis added.)

The judge went on to state:

"The testimony on behalf of the defendant at trial and the testimony of the defendant was to the effect that he did not intend to kill this young woman, that he didn't—my recollection is that he didn't have any memory of committing any of these acts; that the automobile accident he alluded to in his testimony apparently triggered some response from him.

"It was difficult for this court to find that to be the case, I guess. And it is still difficult given the facts that were brought out at the trial and given the actions of the defendant during the course of these eleven shots being fired. It's very difficult for this court to find that this defendant did not know what was going on even

with the posttraumatic stress disorder, which Dr. Parks could not debunk, and which this court certainly had no reason to doubt.

"Even given those—even given that situation I still find, as I found at the first sentencing of this matter, that the aggravating factors here outweigh the mitigating factors. Not that those mitigating factors don't exist and that they didn't exist on the night that this took place, but I don't believe that they in any way explain what happened here or detract from the manner in which it was performed."

In this case, it is clear that the trial judge carefully considered the mitigating factors proposed by the defense and simply made a credibility determination between competing expert opinions regarding the effect of the defendant's mental state on his actions. The court did not reject the three factors outright, but rather concluded that they were not entitled to much weight based upon the evidence presented at trial. As the two aggravating factors discussed above were established by a preponderance of the evidence, it cannot be said that no reasonable person would have agreed with the trial court's conclusion. The trial court did not err in imposing a hard 50 sentence under the facts of this case.

(2) Constitutionality of the Hard 50 Sentence

The defendant argues the Kansas hard 50 scheme is unconstitutional because it imposes an additional punishment on a defendant convicted of first-degree murder based on facts which were not submitted to a jury and proved beyond a reasonable doubt under *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The defendant urges this court to overrule its decision in *State v. Conley,* 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), which held that the Kansas hard 40 scheme was not unconstitutional because it did not increase the maximum length of Conley's life sentence but limited the lower end of the sentence in a manner consistent with *McMillan v. Pennsylvania,* 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986) (facts that do not increase a defendant's punishment beyond that authorized by the underlying statute need not be proven to a jury beyond a reasonable doubt). The defendant criticizes the *Conley* court's reliance upon *McMillan.*

This court has recently rejected similar constitutional challenges to the hard 50 sentencing scheme and declined to overrule *Conley.*

See *e.g., State v. James,* 279 Kan. 354, 358, 109 P.3d 1171 (2005); *State v. Buehler-May,* 279 Kan. 371, 386, 110 P.3d 425, *cert. denied* 546 U.S. 980, 126 S. Ct. 549 (2005); *State v. Robertson,* 279 Kan. 291, 308, 109 P.3d 1174 (2005); *State v. Hurt,* 278 Kan. 676, 686-88, 101 P.3d 1249 (2004). Moreover, this court specifically rejected this argument in the defendant's direct appeal. See *State v. Washington,* 275 Kan. 644, 680, 68 P.3d 134 (2003). As such, the defendant's argument fails.

Affirmed.

LOCKETT, J., Retired, assigned.